IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

**FILED**
JUN 08 2001
Phil Lombardi, Clerk
U.S. DISTRICT COURT

————————————————————————— X

NOVA HEALTH SYSTEMS, DBA REPRODUCTIVE SERVICES,
on behalf of itself, its staff and its patients,

**01CV0419K**

        Plaintiff,

vs.

        Civil Case No.

MIKE FOGARTY, in his Official Capacity as Chief Executive
Officer of the Oklahoma Health Care Authority; LYLE KELSEY,
in his Official Capacity as Executive Director of the Oklahoma
Board of Medical Licensure and Supervision; LESLIE M.
BEITCH, in his Official Capacity as Commissioner of the
Oklahoma State Department of Health; DEAN GANDY, in his
Official Capacity as Executive Director of the University
Hospitals Authority; TERRY L. CLINE, in his Official Capacity
as Commissioner of the Oklahoma Department of Mental
Health and Substance Abuse Services; DAVID L. BOREN, in his
Official Capacity as President of the University of Oklahoma;
DR. JAMES HALLIGAN, in his Official Capacity as President of
Oklahoma State University; AND W. A. DREW EDMONDSON,
in his Official Capacity as Attorney General of the State of
Oklahoma; and Their Agents and Successors.

**COMPLAINT**

        Defendants.

————————————————————————— X

    1.  Plaintiff, by and through its undersigned attorneys, brings this Complaint against the

above-named Defendants, their employees, agents, and successors in office, and in support

thereof alleges the following:

## I.    Preliminary Statement

    2.  This civil rights action, arising under 42 U.S.C. § 1983, challenges the

constitutionality of Section 2 of HB 1727, to be codified in Title 63, Chapter 1, Article 7 of the



Oklahoma Statutes ("the Act"), which imposes new restrictions on the provision of abortions in Oklahoma. The Act penalizes an abortion provider who provides an abortion to any "minor" "without parental consent or knowledge," by making the abortion provider strictly liable for "any subsequent medical treatment such [a] minor may require because of the abortion." The Act fails to provide any of the protections that the United States Supreme Court has mandated for laws imposing a parental consent or notice requirement on the provision of abortions to minors.

3.   The Act became effective upon approval by the Governor of Oklahoma, who signed it on June 4, 2001.

4.   Plaintiff seeks declaratory and injunctive relief against the Act because it violates the Plaintiff's, its staff's, and its patients' rights to due process and equal protection of law guaranteed by the United States Constitution.

5.   The Act is causing ongoing and irreparable harm to the young women of Oklahoma seeking abortions and to Oklahoma's abortion providers including Plaintiff.

## II.   Jurisdiction and Venue

6.   This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

7.   Plaintiff's claim for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

8.   Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.   Parties

### A.    Plaintiff

9.   Plaintiff Nova Health Systems d.b.a. Reproductive Services is a non-profit charitable organization licensed as an abortion provider by the State of Oklahoma, which operates a medical clinic located in Tulsa.  Reproductive Services provides a variety of reproductive health care services, including: abortions; adoption services; pregnancy testing; contraceptive counseling and services; emergency contraception; post-operative exams; non-directive options counseling; and referrals for appropriate medical or social services.  Reproductive Services provides abortions through seventeen (17) weeks of pregnancy as measured from the first day of the woman's last normal menstrual period ("lmp") and confirmed by ultrasound.

10. Approximately 8 percent of Plaintiff's patients seeking abortions are women under the age of 18.  Some of these young women have decided not to involve a parent or legal guardian in their decision to obtain an abortion.  Plaintiff encourages minors who have not already done so to involve a parent in the decision whether to have an abortion.  However, but for the Act, Plaintiff would not require a minor capable of providing informed consent to notify or obtain the consent of one or both parents, nor would the clinic notify parents itself without the patient's permission.  Reproductive Services sues on its own behalf and on behalf of its minor patients seeking abortions.

### B.    Defendants

11. Defendant Mike Fogarty is the Chief Executive Officer and Administrator of the Oklahoma Health Care Authority ("the Authority"), which is a state agency.   Pursuant to Okla. Stat. tit. 63, § 5006, the Health Care Authority is empowered to take various actions in administering the State's medical assistance (Medicaid) plan, including, but not limited to, purchasing health care benefits for Medicaid recipients, entering into contracts for the delivery of state-purchased health care, and assisting in the development of a Uniform Claim Processing

System for use by third-party payors and health care providers. The Oklahoma Health Care Authority is empowered and required to seek to recover payment for medical services provided under Medicaid from liable third parties. See 42 U.S.C. §§ 1396a(a)(25), 1396k; 42 C.F.R. § 433.135 et seq.; Okla. Stat. Ann. tit. 63, §§ 5009.1(A)(2), 5051.1 (West 2001); Okla. Admin. Code § 317:35-5-43. As Administrator of the Health Care Authority, Defendant Fogarty is empowered, *inter alia*, to act for the Authority in virtually all matters and to supervise the activities of the Authority, pursuant to Okla. Stat. tit. 63, § 5008(B). Defendant Fogarty is sued in his official capacity as Chief Executive Officer of the Health Care Authority, as are his agents and successors. Unless restrained by orders of this Court, Defendant Mike Fogarty will perform his duties to ensure enforcement of and/or compliance with the Act.

12. Defendant Lyle Kelsey is Executive Director of the State Board of Medical Licensure and Supervision ("the Board"), a state agency. As such, Defendant Kelsey exercises supervisory powers over the State's physicians and surgeons. The Board has the authority to conduct disciplinary proceedings and impose penalties against physicians and surgeons pursuant to Oklahoma law. See Okla. Stat. tit. 59, §§ 503, 509. Defendant Kelsey and the State Board of Medical Licensure and Supervision are authorized to impose sanctions, including revocation of license, on physicians and surgeons who engage in "unprofessional conduct," which is defined to include "dishonorable or immoral conduct which is likely to deceive, defraud, or harm the public." See Okla. Stat. tit. 59, §§ 503, 509. Defendant Kelsey is sued in his official capacity as Executive Director of the State Board of Medical Licensure and Supervision, as are his agents and successors. Unless restrained by orders of this court, Defendant Lyle Kelsey will perform his duties to ensure enforcement of and/or compliance with the Act.

13. Defendant Leslie M. Beitch, M.D., JD is the Commissioner of the Oklahoma State Department of Health, a state agency. As Commissioner, Defendant Beitch has the power and

duty to supervise the actions of the Oklahoma Department of Health, to cause investigations to

be made, and to enforce the provisions of the State Public Health Code. Okla. Stat. tit. 63, § 1-

106(B)(2). Pursuant to Okla. Stat. tit. 63, § 1-1701B(2)(b), the Department of Health, on behalf

of the State of Oklahoma, has the power to file and prosecute an "action for injunctive relief to

redress or restrain a violation by any person of any provision of [the Public Health Code],"

including the Act. Defendant Leslie Beitch is sued in his official capacity as Commissioner of

the State Department of Health, as are his agents and successors. Unless restrained by orders of

this Court, Defendant Leslie Beitch will perform his duties to ensure enforcement of and/or

compliance with the Act.

14. Defendant Dean Gandy is the Executive Director of the University Hospitals

Authority, a state agency. The University Hospitals are under the jurisdiction, supervision,

management, and control of the University Hospitals Authority. Okla. Stat. tit. 63, §§ 3204,

3208. Facilities of the University Hospitals Authority include Oklahoma Memorial Hospital and

Children's Hospital of Oklahoma. Women who have obtained abortions while minors without

"parental consent or knowledge" may receive "subsequent medical treatment" from facilities of

Defendant University Hospitals Authority, which the woman or the treatment provider may

claim was "required because of the abortion"; in such instances, the University Hospitals

Authority might seek to recover costs of that treatment from the abortion provider. Dean Gandy

is sued in his official capacity as Executive Director of the University Hospitals Authority, as are

his agents and successors. Unless restrained by orders of this Court, Defendant Dean Gandy will

perform his duties to ensure enforcement of and/or compliance with the Act.

15. Defendant Terry L. Cline, Ph.D., is the Commissioner of the Oklahoma Department

of Mental Health and Substance Abuse Services, a state agency. The Department of Mental

Health and Substance Abuse Services administers and operates state institutions for the care and

treatment of the mentally ill and drug- or alcohol-dependent persons. Okla. Stat. tit. 43A, §§ 2-101, 2-102, 3-101. Women who have obtained abortions while minors without "parental consent or knowledge" may receive "subsequent medical treatment" from state institutions administered and operated by Defendant Department of Mental Health and Substance Abuse Services, which the woman or the treatment provider may claim was "required because of the abortion"; in such instances, the Department might seek to recover costs of that treatment from the abortion provider. Defendant Terry Cline is sued in his official capacity as Commissioner of the Department of Mental Health and Substance Abuse Services, as are his agents and successors. Unless restrained by orders of this Court, Defendant Terry Cline will perform his duties to ensure enforcement of and/or compliance with the Act.

16. Defendant David L. Boren is the President of the University of Oklahoma, a state educational institution. The University of Oklahoma includes the University of Oklahoma Health Sciences Center, located in Tulsa, and the University of Oklahoma Medical Center, located in Oklahoma City. Okla. Stat. tit. 70, §§ 3301, 3103, 3307, 3312. Women who have obtained abortions while minors without "parental consent or knowledge" may receive "subsequent medical treatment" from facilities operated by Defendant University of Oklahoma, which the woman or the treatment provider may claim was "required because of the abortion"; in such instances, the University of Oklahoma might seek to recover costs of that treatment from the abortion provider. Defendant Boren is sued in his official capacity as President of the University of Oklahoma, as are his agents and successors. Unless restrained by orders of this Court, Defendant David L. Boren will perform his duties to ensure enforcement of and/or compliance with the Act.

17. Defendant Dr. James Halligan is the President of the Oklahoma State University, a state educational institution. The Oklahoma State University includes the Oklahoma College of

Osteopathic Medicine and Surgery, located in Tulsa County, which provides medical services.

Okla. Stat. tit. 70, § 3423. Oklahoma State University has campuses located in Stillwater, Tulsa,

Oklahoma City, and Okmulgee; the University provides health services to its students at those

campuses through the University Health Services. Women who have obtained abortions while

minors without "parental consent or knowledge" may receive "subsequent medical treatment"

from facilities operated by Defendant Oklahoma State University, which the woman or the

treatment provider may claim was "required because of the abortion"; in such instances, the

Oklahoma State University might seek to recover costs of that treatment from the abortion

provider. Defendant Halligan is sued in his official capacity as President of the Oklahoma State

University, as are his agents and successors. Unless restrained by orders of this Court,

Defendant James Halligan will perform his duties to ensure enforcement of and/or compliance

with the Act.

18. Defendant W. A. Drew Edmondson is the Attorney General of the State of Oklahoma.

As such, he is the chief law officer of the state and is vested with executive authority of the state.

See Okla. Const. Art. VI, § 1; Okla. Stat. tit. 74, § 18. He is empowered to appear for the state

and defend all federal court actions in which the state is interested as a party. Okla. Stat. tit. 74,

§ 18b(A)(2). In addition, he is empowered to seek injunctions on behalf of the State to suppress

the maintaining of a nuisance. See Okla. Stat. tit. 12, § 1397; see also id., tit. 50, § 1. Defendant

Edmondson, whose office is in Oklahoma City, Oklahoma, is sued in his official capacity, as are

his agents and successors. Unless restrained by orders of this Court, Defendant Edmondson will

perform his duties to ensure enforcement of and/or compliance with the Act.

## IV.    The Challenged Statute

19. HB 1727 amends the Public Health Code. The Act was adopted not as a free-

standing measure, but as an amendment to an unrelated bill dealing with nursing home care and

7

facilities.  The Act recites a new law that makes persons performing abortions upon minors strictly liable for some medical expenses.  (A copy of HB 1727 is attached to the Complaint as Exhibit A; Plaintiff is challenging only Section 2 of HB 1727.)

20. The challenged statute, Section 2 of Oklahoma House Bill 1727 ("the Act"), adds the following new section to Article 7C of the State Public Health Code, Okla. Stat. tit. 63, ch. 1:

> Any person who performs an abortion on a minor without parental consent or knowledge shall be liable for the cost of any subsequent medical treatment such minor might require because of the abortion.

21. The Act does not contain any definitions of its terms.

22.  The Act does not include any limit on liability.  Thus, under the Act, abortion providers are strictly liable for performing an abortion on a "minor" without "parental consent or knowledge."

23. HB 1727 became effective on June 4, 2001, when it was signed by the Governor, because it provides that it "shall take effect and be in full force from and after its passage and approval."  HB 1727, § 5.

## V.    The Provision of Abortions to Minors in Oklahoma

24. Women in Oklahoma seek abortions for a variety of physical health, psychological, familial, economic, and personal reasons.

25. In 2000, according to the Oklahoma State Department of Health, 7,182 abortions were performed in the state.  Women under the age of 18 obtained approximately 8 percent of these abortions.  Upon information and belief, a similar number of procedures, with a similar percentage obtained by minors, would be performed in 2001 absent the Act being in effect.

26. Both in Oklahoma and throughout the United States, in the majority of abortions obtained by a minor, one or both of the minor's parents knows that she is obtaining an abortion. The younger the minor, the more likely she will be to involve a parent.  Among those minors

whose parents know about the abortion, the vast majority told one or both parents voluntarily. In situations where the parents find out about the intended abortion without being told by the minor herself, the minor may experience one or more adverse consequences from that parental involvement. Such consequences include being forced by a parent to have the abortion, being subjected to physical violence, being forced to leave home, being forced to carry the pregnancy to term, or the parent experiencing harm to his or her own health.

27. As minors get older it is less likely that they will inform a parent about an abortion.

28. When minors do not involve a parent, they generally have compelling reasons for not doing so. Forced notice can lead to a number of serious adverse consequences, including, but not limited to: physical violence against the minor; physical violence against other family members; forced pregnancy, childbirth and motherhood (i.e., the parent prevents the minor from terminating the pregnancy); or other types of parental retribution against the minor, such as expulsion from the home or other punishment.

29. Minors who are afraid to involve their parents in their decision to obtain an abortion will go to extreme lengths to avoid doing so, including, but not limited to: obtaining illegal abortions; self-inducing abortions; or carrying a pregnancy to term out of fear of retribution if they end their pregnancy. Each of these alternatives poses a serious threat to the minor's life and/or health. In addition, some minors will travel to a jurisdiction where parental involvement is not required or where a judicial bypass of the parental involvement requirement may be obtained, thus necessitating long travel back to their home town in Oklahoma after surgery, even if such travel is medically unadvisable.

30. Although minors are more likely than adults to obtain abortions later in their pregnancy, most abortions performed on minors are performed during the first trimester. Nationally, seventeen percent of teenagers obtain abortions after twelve weeks, compared to

eleven percent of women age 20 and over.  The reasons minors delay in seeking an abortion include delay in discovering their pregnancy and fear of telling their parents or partner that they are pregnant.

31. A legal abortion is an extremely safe procedure.  The risks of complications and mortality from abortion are both very low and are lower than the risks associated with carrying a pregnancy to term.  While the risks associated with abortion are low, those risks increase with gestational age.

32. There has been a reduction in abortion services in Oklahoma since 1982, and this trend is continuing.  There are no abortion providers in 95 percent of the counties in Oklahoma and more than half of Oklahoma women of reproductive age live in counties with no provider.  Thus, many Oklahoma women must travel considerable distance to obtain an abortion.

33. Although many women will travel great distances in order to obtain safe, legal abortions, the farther a woman has to travel to obtain an abortion, the less likely she is to obtain one.  Many parts of Oklahoma are several hours driving distance from the nearest out-of-state provider that does not require parental consent or notice.

34. In general, travel imposes burdens such as increased money and time on women seeking abortions.  The greatest burdens of such travel fall on the poorest, youngest, and least sophisticated women.  Thus, even those young women who are able to avoid Oklahoma's parental involvement requirement by travelling to another state face obstacles.  Some will not successfully reach another state, and will face the Hobson's choice between illegal abortion, self-induced abortion, or continuing an unwanted pregnancy to term.

VI.    **The Act's Vagueness**

35. The meaning of the Act is unclear in several ways, including, but not limited to, the following:

36. First, the meaning of the term "parental consent" is unclear.  The statute provides no indication whether the consent of one or both parents is required in order for an abortion provider to avoid liability under the Act.

37. Second, the meaning of the term "parental consent and knowledge" is unclear, in that the Act does not specify what the parent(s) must know.  For example, is it sufficient that a parent know that the minor plans to seek an abortion, or must the parent know that the minor is obtaining an abortion, or must the parent know that the minor is obtaining an abortion from a specific abortion provider?

38. Third, the use of the phrase "parental consent and knowledge" makes the level of required parental involvement unclear.  It is unclear whether "parental . . . knowledge" in the absence of parental consent would be sufficient to preclude liability, as such an interpretation makes the inclusion of the term "parental consent" superfluous.  Moreover, it is unclear whether "parental . . . knowledge" would be sufficient if a parent(s) explicitly refused to consent to the performance of the abortion, or if one parent consents and the other explicitly does not.

39. Fourth, the costs for which an abortion provider may be liable are uncertain under the Act.  The meaning of the phrase "any subsequent medical treatment such minor might require because of the abortion" is unclear.  Is that limited to post-operative care required due to physical complications arising from the performance of the abortion?  Does it encompass counseling a woman might seek even years after having had an abortion?  What standard is used to determine if the "subsequent medical treatment" is "required": does the woman's subjective opinion as to

whether she "requires" treatment control or must she establish through medical experts that the treatment was "required" according to some medical standard?

40. Fifth, the term "minor" as used in the Act is vague. Chapter 1 of title 63 does not contain a definition of "minor." The term is defined in Chapter 54, dealing with Health Services for Minors, as "any person under the age of eighteen (18) years of age, except such person who is on active duty with or has served in any branch of the Armed Services of the United States shall be considered an adult." Okla. Stat. tit. 63, § 2601. It is not clear whether that definition of "minor" applies to the Act's provision. Moreover, it is not clear whether minors who are authorized by statute to self-consent to medical care -- which include married minors, minors with dependent children, and emancipated minors, see Okla. Stat. tit. 63, § 2602 -- are "minors" as that term is used in the Act.

41. Sixth, the Act is vague in that it provides no guidance as to what process an abortion provider can avoid risk of liability if the minor does have parental consent. For example, it does not specify any steps the provider should take to confirm or document the identity of the parent or the existence of "parental consent or knowledge."

## VII.   The Act's Imposition of a Parental Consent or Notice Requirement

42. The Act has the purpose of imposing a parental consent, or at a minimum, a parental notice, requirement on all abortions provided to minors in Oklahoma.

43. The Act has the effect of imposing a parental consent, or at a minimum, a parental notice, requirement on all abortions provided to minors in Oklahoma.

44. Under the Act, an abortion provider who fails to obtain "parental consent or knowledge" prior to performing an abortion on a minor is exposed to unlimited liability for subsequent medical treatment. That liability is not reduced or limited based on receipt of the patient's informed consent or the exercise of the abortion providers' ordinary care and best

judgment.  In addition, the Act contains no limitation on how long after the abortion was

performed the "subsequent medical treatment" must be obtained in order for the abortion

provider to be liable for costs.

45. The Act appears to provide a cause of action against an abortion provider to any

person or entity that may incur some cost associated with the provision of medical treatment

"require[d] because of the [minor's] abortion."  Depending on where the minor seeks treatment,

such entities could include health facilities operated by the University Hospitals Authority, the

Oklahoma Department of Mental Health and Substance Abuse Services, the University of

Oklahoma, and Oklahoma State University.

46. In addition, the Act exposes abortion providers to potential liability and claims of

liability from the state Medicaid program.  For those minors who are Medicaid-eligible, any

subsequent medical treatment may be covered under the Medicaid program, in which case the

state agency administering Oklahoma's Medicaid plan -- the Oklahoma Health Care Authority --

is under a statutory obligation to take all reasonable measures to ascertain the legal liability of

third parties to pay for care and services provided to individuals under the plan and to seek

reimbursement for the medical assistance provided by the state from any liable third party.  See

42 U.S.C. §§ 1396a(a)(25), 1396k; 42 C.F.R. § 433.135 et seq.; Okla. Stat. Ann. tit. 63, §§

5009.1(A)(2), 5051.1 (West 2001); Okla. Admin. Code § 317:35-5-43.

47. Moreover, the Act may expose abortion providers to the risk of sanctions for

engaging in "unprofessional conduct."  See Okla. Stat. tit. 59, § 509(9).

48. Furthermore, the Act exposes abortion providers to injunctive suits brought in the

name of the State to enjoin the maintaining of a nuisance.  See Okla. Stat. tit. 12, § 1397; id., tit.

50, § 1.

49. In order to avoid all risk of liability, including suits seeking to recover costs of treatment, sanctions for "unprofessional conduct," and suits seeking to enjoin the provision of abortions to minors resulting from passage of the Act, abortion providers will have to obtain "parental consent or knowledge" before performing any abortion upon a minor woman.

50. The requirement for "parental consent or knowledge" applies without limitation to all abortions performed on a "minor," without any exception for minors who are emancipated, married, or have dependent children and are therefore able to self-consent to all other medical care.

51. The requirement for "parental consent or knowledge" applies without limitation to all abortions performed on a "minor," without providing any mechanism for a minor to obtain an abortion without "parental consent or knowledge" when the minor has been physically or sexually abused by a parent, when the minor is mature, or when an abortion would be in the minor's best interest.

52. The requirement for "parental consent or knowledge" applies without limitation to all abortions performed on a "minor," without any exception for situations in which an abortion is needed without delay to preserve the health or life of the minor.

53. If the Act is allowed to remain in effect, it will have a chilling effect on the provision of abortions to minors.  Moreover, compliance with the Act's requirement for "parental consent or knowledge" will cause ongoing and irreparable harm to minor women in Oklahoma.

**VIII.   <u>Causes of Action</u>**

    **A.      First Cause of Action**

54. Plaintiff hereby incorporates by reference Paragraphs 1 through 54, above.

55. Section 2 of HB 1727 violates the right to privacy of Plaintiff's minor patients, guaranteed by the United States Constitution, in that it has the purpose of imposing an undue burden on young women seeking abortions.

**B.      Second Cause of Action**

56. Plaintiff hereby incorporates by reference Paragraphs 1 through 54, above.

57. Section 2 of HB 1727 violates the right to privacy of Plaintiff's minor patients, guaranteed by the United States Constitution, in that it has the effect of imposing an undue burden on young women seeking abortions.

**C.      Third Cause of Action**

58. Plaintiff hereby incorporates by reference Paragraphs 1 through 54, above.

59. Section 2 of HB 1727 violates Plaintiff's right to due process of law, guaranteed by the Fourteenth Amendment to the United States Constitution, in that it fails to describe with adequate clarity what conduct it requires or proscribes and is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.

**D.      Fourth Cause of Action**

60. Plaintiff hereby incorporates by reference Paragraphs 1 through 54, above.

61. Section 2 of HB 1727 violates the rights of Plaintiff and its patients under the equal protection clause of the Fourteenth Amendment of the United States Constitution in each of the following ways:

a. by differentially treating minor women and men;

b. by differentially treating minors seeking abortions and minors seeking other medical services;

     c.  by differentially treating minors who are under the custody and control of a

guardian or legal guardian from minors who are not;

     d.  by differentially treating abortion providers and providers of other medical

services.

## IX.    Injunctive Relief

62. Plaintiff hereby incorporates by reference Paragraphs 1 through 54 above.

63. Plaintiff requests the issuance of an injunction against the operation and enforcement

of the Act to protect it, its staff and its patients from civil and quasi-criminal penalties, to prevent

the chilling of constitutionally protected rights, and to prevent harm to the lives and health of its

patients.  Plaintiff's claims meet the standard for injunctive relief because: (1) Plaintiff is

substantially likely to prevail on the merits of its claims; (2) Plaintiff, its staff and its patients will

suffer irreparable harm for continued violations of its constitutional rights and damage to its

patients' health if the Act remains in effect; (3) the threatened injury to Plaintiff, its staff, and its

patients outweighs any injury that Defendants might suffer if denied the opportunity to enforce

the Act pending resolution of these constitutional issues; and (4) the injunction would not be

adverse to, and in fact would further, the public interest.

WHEREFORE, Plaintiff respectfully asks this Court:

     A.  To issue a temporary restraining order and/or preliminary injunction restraining the

Defendants, their employees, agents, and successors from enforcing Section 2 of HB 1727;

     B.  To enter judgment declaring Section 2 of HB 1727 to be in violation of the United

States Constitution and 42 U.S.C. § 1983 and to permanently enjoin it; and,

     C.  To grant such other and further relief as this Court should find just and proper,

including reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Dated:  June _7_, 2001                                   Respectfully submitted,

 

Bebe J. Anderson*                                        M. M. Hardwick, OBA #3847
The Center for Reproductive                              P.O. Box 35975
    Law & Policy                                      Tulsa, OK  74153
120 Wall Street, 14th Floor                              3806 East 53rd Street
New York, NY 10005                                       Tulsa, OK 74135
(917) 637-3600                                            (918) 749-3313
*(f)* (917) 637-3666                                     *(f)* (918) 742-1819

Counsel for Plaintiff

*Application for admission *pro hac vice* being filed.

OKLAHOMA BILL TEXT

ENROLLED

HOUSE BILL NO. 1727

By: Sullivan (John), Nance, Adkins, Balkman, Benge, Calvey, Cargill,

Coleman, Dank, Davis, Ericson, Friskup, Graves, Greenwood, Hastings, Hiett,

Jones, Liotta, Maddux, O'Neal, Perry, Peters, Peterson, Piatt, Pope (Tim),

Roggow, Smaligo, Smith (Hopper), Steele, Sullivan (Leonard), Tibbs, Tyler,

Vaughn, Webb, Winchester and Young of the House

and

Wilkerson of the Senate


VERSION: Enacted

June 4, 2001
Rice

An Act relating to public health and safety; amending 63 O.S. 1991, Section
1-1940, as last amended by Section 17, Chapter 340, O.S.L. 2000 (63 O.S.
Supp. 2000, Section 1-1940), which relates to the Nursing Home Care Act;
modifying powers and duties of the Attorney General; making persons performing
abortions liable for certain medical expenses under certain circumstances;
amending Section 1, Chapter 340, O.S.L. 2000 and Section 2, Chapter 340,
O.S.L. 2000, as amended by Section 31, Chapter 418, O.S.L. 2000 (56 O.S. Supp.
2000, Section 2002), which relates to the Oklahoma 2001 Healthcare Initiative;
adding duties to the Oklahoma Healthcare Initiative; modifying calculation for
determining certain fee; making certain provisions void under certain
circumstances; and declaring an emergency.


TEXT:

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:


SECTION 1. AMENDATORY 63 O.S. 1991, Section 1-1940, as last amended by
Section 17, Chapter 340, O.S.L. 2000 (63 O.S. Supp. 2000, Section 1-1940), is
amended to read as follows:

Copyright © 2001 State Net. All rights reserved.

EXHIBIT A

Section 1-1940. A. The operation or maintenance of a facility in violation of the Nursing Home Care Act or rules promulgated by the State Board of Health, pursuant thereto, is hereby declared a public nuisance, inimical to the public welfare.

B. The State Commissioner of Health or the Department of Human Services, in the name of the people of the state, through the Attorney General, or the district attorney of the county in which the facility is located, <<- or the Attorney General ->> may, in addition to other remedies herein provided, bring action for an injunction to restrain such violation or to enjoin the future operation or maintenance of any such facility.

C. 1. Any person with personal knowledge or substantial specific information who believes that the Nursing Home Care Act, a rule promulgated thereto, or a federal certification rule applying to a facility may have been violated may file a complaint.

2. The complaint may be submitted to the State Department of Health, in writing, by telephone, or personally. An oral complaint shall be reduced to writing by the Department.

3. Any person who willfully or recklessly makes a false complaint or a report without a reasonable basis in fact for such a complaint, under the provisions of the Nursing Home Care Act, shall be liable in a civil suit for any actual damages suffered by a facility for any punitive damages set by the court or jury which may be allowed in the discretion of the court or jury when deemed proper by the court or jury.

4. The substance of the complaint shall be provided to the licensee, owner or administrator no earlier than at the commencement of the on-site inspection of the facility which takes place pursuant to the complaint.

5. Upon receipt of a complaint pursuant to this subsection, the Department shall determine whether the Nursing Home Care Act, a rule promulgated pursuant thereto, or a federal certification rule for facilities has been or is being violated and whether the Department has jurisdiction over the complaint area. If the Department does not have jurisdiction over the complaint area, the complaint shall not be investigated by the Department and notice of the decision not to investigate shall be given to the complainant. The complaint shall be immediately referred to the appropriate agency having jurisdiction

Copyright © 2001 State Net. All rights reserved.

over the complaint area. A report summarizing the complaint investigation shall be made in writing. The Department shall give priority to investigations of complaints which allege continuing violations or which threaten the health and safety of residents.

6. In all cases, the Department shall inform the complainant of its findings within ten (10) working days of its determination unless otherwise indicated by the complainant. The complainant may direct the Department to send a copy of such findings to one other person. The notice of such findings shall include a copy of the written determination, the remedial action taken, if any, and the state licensure or federal certification, or both, on which the violation is listed.

D. 1. Upon receipt of a complaint submitted to the State Department of Health by the Department of Human Services <<+ or the Attorney General +>> which alleges a violation of the Nursing Home Care Act, any rule promulgated thereto, or federal certification rules, and which also alleges that such violation is a serious threat to the health, safety and welfare of a resident of a nursing facility, the State Department of Health shall take immediate action to remedy the violation based upon the complaint of the Department of Human Services.

2. The Department of Human Services <<+ or the Attorney General as applicable +>> shall be deemed a party pursuant to the Administrative Procedures Act for purposes of any complaint made by the Department of Human Services <<+ or the Attorney General as applicable +>> to the State Department of Health for violations of the Nursing Home Care Act, rules promulgated thereto or federal certification rules.

a. Within thirty (30) days of receipt of a final investigative report submitted by the Department of Human Services <<+ or the Attorney General as applicable +>> pursuant to this section, the State Department of Health shall provide the Department of Human Services with a written summary of any action taken pertaining to the complaint including, but not limited to, any inspection or actions which may be taken by the State Department of Health.

b. Whenever the Department of Human Services <<+ or the Attorney General as applicable +>> believes that the conditions giving rise to a complaint alleging a serious threat to the health, safety and welfare of a resident of a nursing facility have not been adequately addressed, the Department of Human Services may request a hearing on the complaint as provided by Section 309 of Title 75 of the Oklahoma Statutes.

Copyright © 2001 State Net. All rights reserved.

E. A written determination, notice of violation and remedial action taken concerning a complaint shall be available for public inspection at the facility.

F. The Department shall seek any remedial action provided under <<- this act ->> <<+ the Nursing Home Care Act +>> for violations documented during complaint investigations.

G. The State Board of Health shall promulgate rules governing the receipt, investigation and resolution of complaints and reports of violations. The rules promulgated by the Board shall provide for the expeditious investigation and resolution of a complaint or report including, but not limited to:

1. An easily understood and readily accessible method of submitting complaints and reports regarding complaints;

2. Actions to be taken upon the receipt of a complaint or report of a complaint;

3. Establishing a priority for investigations of complaints. Specifically, the Department shall give higher priority to investigations of complaints which allege continuing violations or which threaten the health, safety or welfare of residents;

4. The timely investigation of the complaint or report of a complaint;

5. Written reports to the complainants or persons filing the complaint report;

6. Any necessary or appropriate remedial action as determined by the findings of the investigation;

7. The protection of the identity of the complainant, provided that the person is a current or past resident or resident's representative or designated guardian or a current or past employee of a facility;

8. Specific information to be included in investigative protocols which

Copyright © 2001 State Net. All rights reserved.

must include at a minimum an interview with:

    a. the complainant,

    b. the resident, if possible, and

    c. any potential witness, collateral resource or affected resident; and

    9. Any additional rules necessary for the timely and thorough investigation and resolution of complaints.

    H. The Department is authorized to employ hearing officers, and hire attorneys to represent the Department and Commissioner to ensure that this and other laws pertaining to the Department are properly executed.

    SECTION 2. NEW LAW. A new section of law to be codified in the Oklahoma Statutes as Section 1-738 of Title 63, unless there is created a duplication in numbering, reads as follows:

    Any person who performs an abortion on a minor without parental consent or knowledge shall be liable for the cost of any subsequent medical treatment such minor might require because of the abortion.

    SECTION 3. AMENDATORY Section 1, Chapter 340, O.S.L. 2000, is amended to read as follows:

    Section 1. A. This act shall be known and may be cited as the "Oklahoma 2001 Healthcare Initiative".

    B. 1. The purpose of the Oklahoma 2001 Healthcare Initiative is to improve the public health care system of Oklahoma through increased health care services and benefits.

    2. In order to upgrade Oklahoma's health care system, the Oklahoma Legislature through the Oklahoma 2001 Healthcare Initiative hereby provides funding for the most critical needs of the vulnerable citizens and residents of this state.

Copyright © 2001 State Net. All rights reserved.

C. To this end, the Oklahoma Legislature hereby requires:

1. The Oklahoma Health Care Authority to:

a. increase by eighteen percent (18%), provided the increase does not exceed federal limits, the Medicaid reimbursement rate to the following persons or entities providing Medicaid-authorized services to eligible persons:

(1) physicians including, but not limited to, psychiatrists and osteopathic physicians,

(2) home health care providers,

(3) laboratory and clinic services providers,

(4) ambulatory clinic providers, and

(5) other Medicaid-authorized medical services providers including, but not limited to: chiropractors, optometrists, opticians, psychologists, speech pathologists, and occupational therapists,

b. increase by ten percent (10%) the Medicaid reimbursement rate to persons providing Medicaid behavioral health counseling services to eligible persons,

c. increase the hospital inpatient day limit for Medicaid services from twelve (12) days to twenty-four (24) days per year,

d. increase the Medicaid reimbursement rate to the Sooner Care Plus Program for:

(1) maternity level of care services

increase by $271.00 per delivery

Copyright © 2001 State Net. All rights reserved.

(2)  emergency room services

increase emergency room visit rate

increase nonemergency room visit rate

(3)  ambulatory surgical services                    10% increase

(4)  inpatient hospital services                     12% increase

(5)  neonatal inpatient hospital
services                                             20% increase

    e.  increase the Medicaid reimbursement rate to hospitals in the
Fee-For-Service Program for:

(1)  maternity level of care services,

Mother                  increase by $55.50 per day

Child                   increase by $55.50 per day

(2)  emergency room services

increase emergency room visit rate

increase nonemergency room visit rate

(3)  ambulatory surgical services                    10% increase

(4)  inpatient hospital services                     12% increase

Copyright © 2001 State Net. All rights reserved.

(5) neonatal inpatient hospital services               20% increase

(6) critical access hospital services                  38% increase

f. increase the Medicaid reimbursement rate sixty percent (60%) for dental services provided to eligible persons, <<- and ->>

g. increase the Medicaid reimbursement rate forty percent (40%) for ambulance services provided to eligible persons <<+ , and +>>

<<+ h. reimburse licensed nursing facilities that are not Medicaid certified for purposes specified by Sections 1-1925.2, 5022.1 and 5022.2 of Title 63 of the Oklahoma Statutes +>> ;

2. The State Department of Health, with the cooperation of the Oklahoma Health Care Authority and the Department of Human Services to:

a. develop and implement a comprehensive, evidence-based tobacco prevention and cessation program from state-appropriated funds, available Medicaid funds, available grant funds, and available Temporary Assistance for Needy Families block grant monies. The program shall:

(1) consist of the following four cornerstones:

(a) community-based initiatives,

(b) voluntary classroom programs in public schools,

(c) cessation assistance, and

(d) public education media programs, and

(2) utilize strategies including, but not limited to, involving school nurses in youth tobacco prevention efforts, and utilizing other efforts that have been demonstrated to be effective by the United States Centers for Disease Control and Prevention in an effort to:

Copyright © 2001 State Net. All rights reserved.

(a) lower smoking rates among Oklahoma youths,

(b) reduce tobacco consumption by Oklahomans, and

(c) reduce exposure related to secondhand tobacco smoke.

The program shall comply with the provisions of Section 19 <<- of this act ->> , <<+ Chapter 340, O.S.L. 2000, +>>

b. expend monies made available from the Legislature and other sources for such programs authorized by this section with a goal of encouraging additional matching direct and indirect funds for tobacco prevention and cessation efforts in Oklahoma, and

c. report by January 1st of each year to the Legislature on the implementation of the comprehensive, evidence-based tobacco prevention and cessation program specified by this section;

3. The Department of Human Services to:

a. increase Medicaid reimbursement rates to:

(1) direct care staff who provide personal care and ADvantage waiver services to Medicaid-eligible adults including, but not limited to, the reimbursement rate for respite care, meal preparation and housekeeping, and

(2) habilitation training specialists who serve developmentally disabled persons including, but not limited to, the reimbursement rate for assisting and training in self-care, and daily living and prevocational skills,

b. increase contract amount by thirteen percent (13%) for salaries of Older Americans Act nutrition site employees who provide meals and nutrition services including, but not limited to, reimbursement rates for home-delivered meals, congregate meals and nutrition education,

c. purchase services up to Ten Thousand Dollars ($10,000.00) per child for developmentally disabled children who are on the waiting list to receive

Copyright © 2001 State Net. All rights reserved.

services including, but not limited to, habilitation treatment specialist services, medical supplies, home health care, therapy and respite care services,

d. purchase services up to Fifteen Thousand Dollars ($15,000.00) per adult for developmentally disabled adults who are on the waiting list to receive services including, but not limited to, habilitation treatment specialist services, medical supplies, home health care, therapy and respite care services, and

e. purchase ADvantage waiver services for developmentally disabled persons without cognitive impairment.

<<+ D. If any provision of this section, or the application thereof, is determined by any controlling federal agency, or any court of last resort to prevent the state from obtaining federal financial participation in the state s Medicaid program, such provision shall be deemed null and void as of the date of the nonavailability of such federal funding and through and during any period of nonavailability. All other provisions of the bill shall remain valid and enforceable. +>>

SECTION 4. AMENDATORY Section 2, Chapter 340, O.S.L. 2000, as amended by Section 31, Chapter 418, O.S.L. 2000 (56 O.S. Supp. 2000, Section 2002), is amended to read as follows:

Section 2002. A. For the purpose of providing quality care enhancements, the Oklahoma Health Care Authority is authorized to and shall assess a Nursing Facilities Quality of Care Fee pursuant to this section upon each nursing facility licensed in this state. Quality of care enhancements include, but are not limited to, the purposes specified in this section.

B. As a basis for determining the maximum Nursing Facilities Quality of Care Fee assessed upon each licensed nursing facility, the Oklahoma Health Care Authority shall calculate a uniform per-patient day rate. The rate shall be set at six percent (6%) of the total annual patient gross revenue of all licensed nursing facilities in this state <<+ or six percent (6%) of the total annual patient gross revenues of the individual licensed nursing facility, whichever is less +>> .

C. The Nursing Facilities Quality of Care Fee owed by a licensed nursing facility shall be calculated by the Oklahoma Health Care Authority by adding

Copyright © 2001 State Net. All rights reserved.

the daily patient census of a licensed nursing facility, as reported by the facility for each day of the month, and by multiplying the ensuing figure by a uniform per-patient day rate determined pursuant to the provisions of subsection B of this section.

D. Each licensed nursing facility which is assessed the Nursing Facilities Quality of Care Fee shall be required to file a report on a monthly basis with the Oklahoma Health Care Authority detailing the daily patient census and patient gross revenues at such time and in such manner as required by the Oklahoma Health Care Authority.

E. 1. The Nursing Facilities Quality of Care Fee for a licensed nursing facility for the period beginning October 1, 2000, shall be determined using the daily patient census and annual patient gross revenues figures reported to the Oklahoma Health Care Authority for the calendar year 1999 upon forms supplied by the Authority.

2. The Nursing Facilities Quality of Care Fee for the fiscal year beginning July 1, 2001, and each fiscal year thereafter shall be determined by:

a. using the daily patient census and patient gross revenues reports received by the Authority covering the six-month period October 1 through March 31 of the prior fiscal year, and

b. annualizing those figures.

F. The payment of the Nursing Facilities Quality of Care Fee by licensed nursing facilities shall be an allowable cost for Medicaid reimbursement purposes.

G. 1. There is hereby created in the State Treasury a revolving fund to be designated the "Nursing Facility Quality of Care Fund".

2. The fund shall be a continuing fund, not subject to fiscal year limitations, and shall consist of:

a. all monies received by the Authority pursuant to this section and otherwise specified or authorized by law,

Copyright © 2001 State Net. All rights reserved.

b. monies received by the Authority due to federal financial participation pursuant to Title XIX of the Social Security Act, and

c. interest attributable to investment of money in the fund.

3. All monies accruing to the credit of the fund are hereby appropriated and shall be budgeted and expended by the Authority for:

a. reimbursement of the additional costs paid to <<- Medicaid-certified ->> <<+ licensed +>> nursing facilities for purposes specified by Sections <<- 4 ->> <<+ 1-1925.2 +>> , <<- 5 ->> <<+ 5022.1 +>> and <<- 6 ->> <<+ 5022.2 +>> of <<- this act ->> <<+ Title 63 of the Oklahoma Statutes +>> ,

b. reimbursement of the Medicaid rate increases for intermediate care facilities for the mentally retarded (ICFs/MR),

c. nonemergency transportation services for nursing home clients,

d. eyeglass and denture services for nursing home clients,

e. ten additional ombudsmen employed by the Department of Human Services,

f. ten additional nursing facility inspectors employed by the State Department of Health,

g. pharmacy and other Medicaid services to qualified Medicare beneficiaries whose incomes are at or below one hundred percent (100%) of the federal poverty level; provided however, pharmacy benefits authorized for such qualified Medicare beneficiaries shall be suspended if the federal government subsequently extends pharmacy benefits to this population,

h. funds to conduct a study of nursing facility reimbursement methodology,

i. costs incurred by the Oklahoma Health Care Authority in the administration of the provisions of this section and any programs created pursuant to this section,

Copyright © 2001 State Net. All rights reserved.

j. durable medical equipment and supplies services for elderly adults, and

k. personal needs allowance increases for residents of nursing homes and Intermediate Care Facilities for the Mentally Retarded (ICFs/MR) from Thirty Dollars ($30.00) to Fifty Dollars ($50.00) per month per resident.

4. Expenditures from the fund shall be made upon warrants issued by the State Treasurer against claims filed as prescribed by law with the Director of State Finance for approval and payment.

5. The fund and the programs specified in this section are exempt from budgetary cuts, reductions, or eliminations caused by the lack of general revenue funds.

6. The Medicaid rate increases for intermediate care facilities for the mentally retarded (ICFs/MR) shall not exceed the net Medicaid rate increase for nursing facilities including, but not limited to, the Medicaid rate increase for which Medicaid-certified nursing facilities are eligible due to the Nursing Facilities Quality of Care Fee less the portion of that increase attributable to treating the Nursing Facilities Quality of Care Fee as an allowable cost.

7. The reimbursement rate for nursing facilities shall be made in accordance with Oklahoma's Medicaid reimbursement rate methodology and the provisions of this section.

8. No nursing facility shall be guaranteed, expressly or otherwise, that any additional costs reimbursed to the facility will equal or exceed the amount of the Nursing Facilities Quality of Care Fee paid by the nursing facility.

H. 1. In the event that federal financial participation pursuant to Title XIX of the Social Security Act is not available to the Oklahoma Medicaid program, for purposes of matching expenditures from the Nursing Facility Quality of Care Fund at the approved federal medical assistance percentage for the applicable fiscal year, the Nursing Facilities Quality of Care Fee shall be null and void as of the date of the nonavailability of such federal funding, through and during any period of nonavailability.

Copyright © 2001 State Net. All rights reserved.

2. In the event of an invalidation of this section by any court of last resort under circumstances not covered in subsection I of this section, the Nursing Facilities Quality of Care Fee shall be null and void as of the effective date of that invalidation.

3. In the event that the Nursing Facilities Quality of Care Fee is determined to be null and void for any of the reasons enumerated in this subsection, any Nursing Facilities Quality of Care Fee assessed and collected for any periods after such invalidation shall be returned in full within sixty (60) days by the Oklahoma Health Care Authority to the nursing facility from which it was collected.

I. 1. If any provision of this section orthe application thereof shall be adjudged to be invalid by any court of last resort, such judgment shall not affect, impair or invalidate the provisions of the section, but shall be confined in its operation to the provision thereof directly involved in the controversy in which such judgment was rendered. The applicability of such provision to other persons or circumstances shall not be affected thereby.

2. This subsection shall not apply to any judgment that affects the rate of the Nursing Facilities Quality of Care Fee, its applicability to all licensed nursing homes in the state, the usage of the fee for the purposes prescribed in this section, and/or the ability of the Oklahoma Health Care Authority to obtain full federal participation to match its expenditures of the proceeds of the fee.

J. The Oklahoma Health Care Authority shall promulgate rules for the implementation and enforcement of the Nursing Facilities Quality of Care Fee established by this section.

K. The Authority may assess administrative penalties, and shall promulgate rules which provide for the assessment of administrative penalties, upon nursing facilities which fail to submit the fee required by this section in a timely manner.

L. As used in this section:

1. "Nursing facility" means any home, establishment or institution, or any portion thereof, licensed by the State Department of Health as defined in Section 1-1902 of Title 63 of the Oklahoma Statutes;

Copyright © 2001 State Net. All rights reserved.

2. "Medicaid" means the medical assistance program established in Title XIX of the federal Social Security Act and administered in this state by the Oklahoma Health Care Authority;

3. "Patient gross revenues" means gross revenues received in compensation for services provided to residents of nursing facilities including, but not limited to, client participation. The term "patient gross revenues" shall not include amounts received by nursing facilities as charitable contributions; and

4. "Additional costs paid to Medicaid-certified nursing facilities under Oklahoma's Medicaid reimbursement methodology" means both state and federal Medicaid expenditures including, but not limited to, funds in excess of the aggregate amounts that would otherwise have been paid to Medicaid-certified nursing facilities under the Medicaid reimbursement methodology which have been updated for inflationary, economic, and regulatory trends and which are in effect immediately prior to the inception of the Nursing Facilities Quality of Care Fee.

<<+ M. If any provision of this section, or the application thereof, is determined by any controlling federal agency, or any court of last resort to prevent the state from obtaining federal financial participation in the state s Medicaid program, such provision shall be deemed null and void as of the date of the nonavailability of such federal funding and through and during any period of nonavailability. All other provisions of the bill shall remain valid and enforceable. +>>

SECTION 5. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval.

2001 OK H.B. 1727 (SN)

Copyright © 2001 State Net. All rights reserved.